IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10-10041-06-WEB |
| | ) | |
| JUAN ROMERO a/k/a "Frost", | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## Memorandum and Order

This matter came before the court on September 23, 2010 for a hearing on defendant Juan Romero's motion to suppress evidence. Mr. Romero also made an oral motion at the hearing to replace his court-appointed CJA counsel. The court orally denied both motions in the course of the hearing. This written memorandum will supplement the court's oral rulings.

I. *Motion to Substitute Counsel*.

A 37-count Indictment charging eleven defendants was filed in this case on March 3, 2010. Defendant Juan Romero was charged with a single count of unlawful possession with intent to distribute a mixture or substance containing cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Mr. Romero made his initial appearance on March 10, 2010, on a writ from state custody, and CJA Panel Attorney Tony Atterbury was appointed to represent him. The court entered a general order of discovery and scheduling on March 31, 2010, which required disclosure of various discovery materials. The trial was initially scheduled for May 18, 2010, but was continued to October 5, 2010, upon a defense request for additional time to review extensive discovery materials, including transcripts of recorded telephone calls. On July 15, 2010, Mr. Atterbury filed a motion to suppress on the defendant's behalf, which challenged the

lawfulness of the search underlying the charge against Mr. Romero. The Government filed a response asserting that the search was lawful, and additionally filed an Information pursuant to 21 U.S.C. § 851 alleging that Mr. Romero had a prior conviction that would subject him to increased penalties upon conviction in this matter.

At the September 23 hearing, Mr. Romero moved to replace Mr. Atterbury as his counsel, complaining that counsel had not sufficiently explained the motion to suppress to him, and that "the only thing he talks to me about instead of anything else is just taking a plea bargain for ten to fifteen to twenty years or something." He further complained that his lawyer failed to secure a witness for the hearing – a neighbor named "Carlos" whom the defendant said would provide helpful testimony on the motion to suppress. Mr. Romero voiced other complaints as well, and said he did not agree with his attorney's recommendations and "would like a lawyer that would agree with me on what I think is in my best interests."

"The constitutional guaranty to be represented by counsel does not confer upon the accused the right to compel the court to appoint such counsel as the accused may choose. On the contrary, the selection of counsel to be appointed for an accused rests in the sound discretion of the court." *Tibbett v. Hand*, 294 F.2d 68, 73 (10th Cir.1961). In these circumstances, the Sixth Amendment guarantees the right to effective counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). As noted in *United States v. Porter*, 405 F.3d 1136 (10th Cir. 2005):

> To warrant a substitution of counsel, the defendant must show good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict. Good cause for substitution of counsel consists of more than a mere strategic disagreement between a defendant and his attorney ... rather there must be a total breakdown in communications. To prove a total breakdown in communication, a defendant must put forth evidence of a severe

> and pervasive conflict with his attorney or evidence that he had such minimal contact with the attorney that meaningful communication was not possible.

*Id*. at 1140.

Upon inquiry, the court determined that Mr. Atterbury has in fact represented the defendant in accordance with the standards of care required for competent and effective attorneys. He has met with the defendant repeatedly, has provided sufficient explanation to the defendant of his rights, and has taken appropriate steps to represent the interests of the defendant, including negotiating with the Government on the defendant's behalf and filing a motion to challenge the Government's evidence. It is apparent the defendant does not like the recommendation of his attorney as to the best course of action to take, but that fact does not warrant substitution of counsel. The information presented shows there are continuing communications between counsel and client, and no evidence of a severe conflict. Any glitches in communication here appear to be due to the defendant's recalcitrance, such as his last-minute suggestion of a witness for the motion to suppress. (Based upon the defendant's statements, the court authorized a subpoena for the witness "Carlos" to appear at the hearing. The witness was located by the Government and appeared for the hearing, but his testimony was in no way helpful to the defendant.). Mr. Atterbury filed an appropriate motion on the defendant's behalf and capably presented the matter to the court. Counsel expressed his continuing readiness to represent the defendant, including representation at trial if the defendant maintains his current desire to have a trial on the charge against him. The court concludes that the defendant has not shown good cause to replace his counsel, and his motion for substitution of counsel is denied.

II. *Motion to Suppress*.

A. <u>Facts</u>.  Based upon the evidence presented at the hearing, the court finds the following facts.  The defendant Juan Romero pled guilty in Sedgwick County (Kansas) District Court, Case No. 07 CR 1887, to a charge involving possession with intent to sell cocaine.  At the time, the defendant had already been convicted in several other felony cases in Sedgwick County.  On November 13, 2008, he received a sentence of 18 months' probation, with an underlying 41-month prison sentence.  Various conditions of probation were imposed, including that he possess no firearms, that he obey all laws, that he not consume alcohol or be present when others consume it, and that he obey the directives of his probation officer.  As part of his probation he signed a Supervision Agreement on November 18, 2008 that included a provision stating: "I will allow a search without a warrant of my residence, my vehicle, my person or any property under my control, including computers and phone records, upon request by my ISO [Intensive Supervision probation Officer], or other SCDOC [Sedgwick County Dept. of Corrections] staff, with assistance from any law enforcement officer."  Additionally, in February of 2009, he signed a Supervision Agreement "Gang Attachment," which among other things imposed conditions requiring that the defendant – whom police had identified as a member of the Vato Loco Boys gang – not associate with anyone affiliated with the VLB gang.

In April of 2009, Youthville caseworker Heather Kilmer, who works with families involved in Child In Need of Care proceedings, had contact with the defendant's wife, Elizabeth Trevino.  Kilmer had worked on a case involving Trevino, defendant Romero and their children since April of 2008.  As a result of that contact, Kilmer subsequently looked at the defendant's "My Space" web page on the internet.  The web page showed various photos, including pictures of the defendant with other individuals apparently flashing gang signs, pictures of the defendant

4

with his children, pictures of a firearm with two loaded clips, and large amounts of cash. Kilmer noticed that the desk on which the handgun and cash were sitting looked familiar, and she thought it might be one she had seen in the defendant's residence. On or about May 7, 2009, Kilmer informed ISO Kristi Winter of the photographs.

Winter was Romero's supervising probation officer at the time, and she printed the pictures off from the web page on May 8, 2009. Based on the photos, Winter believed the defendant might be involved in gang and criminal activity. She believed the photos showed violations of his gang restriction, and she noted that a picture of the gun showed part of a necklace that was similar to one the defendant was wearing in one of the other photos. Kilmer had informed her that the desk on which the gun sat was similar to one in defendant's house. Winter also believed that the large amount of cash indicated possible drug activity. Winter obtained approval from her supervisor to conduct a search of defendant's residence, and she also conveyed the information to the sentencing judge from defendant's case. She informed the judge that she intended to do a search based on the photos; the judge responded by email thanking her for the information and telling her to let him know the results of the search. No search warrant was requested or issued from the judge.

On May 13, 2009, Winter and two other ISO officers, Brian Ronk and Regina Teer, went to the defendant's residence at 3210 North Wellington Place in Wichita to conduct a search. They were accompanied by several detectives from the Wichita Police Department, who came at their request and pursuant to SCDOC policy requiring law enforcement backup. They knocked on the front door of the residence, but no one answered, and a neighbor informed them that the residents had just left. The defendant was required to wear a GPS ankle bracelet, and Winter

was able to determine his location. Winter, Ronk and a couple of WPD detectives proceeded to a restaurant where the defendant was located. Winter told the defendant he needed to get in his vehicle and drive back to his house, and that the officers would follow him. Romero went out to his vehicle and, together with his wife, began to drive back to his residence.

Meanwhile, two detectives and ISO Teer stayed at defendant's residence. While they were in their car waiting, a neighbor came up and told them he just saw a Hispanic male jump over the back fence and run in the house. Detective Reichenberger[1] ran around to the back to watch the back door, although he could not get close because a pit bull with a recent litter of pups in the enclosed back yard vociferously objected to his presence. Reichenberger saw a man come out of the house with a package in his hand. Reichenberger told him to get on the ground, but the man ran back into the house. A short time later, he emerged again, without the package. Reichenberger drew his weapon but could not advance because of the pit bull, so he told the man to go back through the house and surrender to officers at the front door. The man did so, and Reichenberger subsequently went around to the front when he was informed by Detective Boll that the man was in custody.

Defendant Romero and his wife meanwhile, followed by officers, arrived back at the house, and ISO Winter spoke with Romero. She told him they had reason to believe there were guns or drugs or both in the house. The testimony was somewhat vague as to how Winter asked Romero for consent to search the house, although the evidence shows that she did make some kind of request to search. At one point, Winter testified that "I advised him that we were going to be searching his home and I asked him before we did the search if there would be anything

---

[1] The detective's name also appears as "Richenberger" in the exhibits.

that would violate his probation found in the home." She further testified that "he said, no, there was nothing," and she "asked for his consent to search the house and he said, search it because we wouldn't find anything." Ronk testified that Winter told Romero they "were going to be searching the house" in response to a question from Romero asking what all the officers were doing there. Winter testified that Romero's girlfriend unlocked the door and let them in, although the evidence indicates that the door was likely already open from the man who had surrendered himself at the front door. The evidence showed that the WPD detectives were subject to the control and direction of the ISO's insofar as the search of the defendant's residence was concerned.

Reichenberger took the man in custody to the side of the house and gave him Miranda warnings. The man agreed to talk and told the detective that he had received a phone call from Juan Romero telling him to go in the house and get rid of Juan's dope. He subsequently showed the officer a package of cocaine hidden under the stove. Officers also found a scale in the house and a duffel bag with marijuana residue.

The photos appearing on the defendant's My Space page were not dated, and the officers could not tell from the web page when the photos were taken or when they had been posted on the web site. The web site did indicate that the web page was last logged into on May 2, 2009. The officers did not undertake any investigation to determine when the photos were posted.

The defendant testified at the hearing that the photos on his web page were posted "probably in 07 sometime" by a friend of his. He said the gun was "just a picture of a gun that was pretty nice gun [sic] and I – I liked it, and since I couldn't have a gun I just would like – would have liked to have a picture of a gun because I never owned a gun." He said the pictures

7

of the cash and gun were from his friend's camera, and that "when she downloaded her pictures that I wanted from my kids that she took for me, they ... were also downloaded on my computer." The defendant denied that ISO Winter or any other officer asked for his permission to search the house. The defendant said he used to hang around with gang members but denied having done so for years. He said the pictures of him flashing gang signs on his web site "were pretty old, like ... years and years back" and that they were probably taken around 2005 and he posted them in 2007.

  B. Discussion. Defendant challenges the lawfulness of the search, arguing officers did not obtain valid consent and that the photos from the web site did not provide reasonable suspicion for a search. He argues the photos were posted prior to the time he was placed on probation and that any information in them was stale. The Government contends the defendant consented to the search by signing his Supervision Agreement, regardless of whether there was reasonable suspicion for a search. *Citing United States v. Johnson*, 649 F.Supp.2d 1227 (D. Kan. 2009). It further contends the photos provided reasonable suspicion for a search, arguing that although the ISO did not know the date of the pictures, the apparent fact that the defendant had recently logged into the web site provided a reasonable basis to believe he might be currently in possession of a gun.

  "A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). Searches of a home ordinarily require a warrant based upon probable cause. "But for searches of probationers and parolees and their homes, the Supreme Court has embraced two exceptions to the warrant and probable-cause requirements: (1) a special-needs exception and (2) a

totality-of-the-circumstances exception." *United States v. Warren*, 566 U.S. 1211, 1215 (10th Cir. 2009). The first exception applies when the special needs of a State make the warrant and probable cause requirement impracticable. *Id*. The exception recognizes that probationers are under a criminal justice sentence and do not enjoy the absolute liberty of other citizens, but a conditional liberty that is dependent upon the observance of special restrictions. *Id*. Those restrictions ensure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer being at large. *Id*. The special needs of the State in operating a probation system could be undermined if probation searches were subject to the usual requirements of a warrant with probable cause. *Id*. A standard requiring probable cause would reduce the deterrent effect of the supervisory arrangement. *Id*. at 1215-16 (*citing Griffin, supra*). According to the Court in *Griffin*:

> In such circumstances it is both unrealistic and destructive of the whole object of the continuing probation relationship to insist upon the same degree of demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts. In some cases-especially those involving drugs or illegal weapons-the probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a probationer does damage to himself or society. The agency, moreover, must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character, and circumstances.

The *Griffin* Court concluded that the state's special need to supervise probationers made a warrant requirement impracticable and justified replacement of the standard of probable cause by "reasonable grounds," and it upheld the warrantless search in that case "because it was conducted pursuant to a valid regulation governing probationers." *Warren*, 566 F.3d at 1216 (quoting *Griffin*, 483 U.S. at 880).

"The second exception to the warrant and probable-cause requirements authorizes warrantless searches without probable cause (or even reasonable suspicion) by police officers with no responsibility for parolees or probationers when the totality of the circumstances renders the search reasonable." *Warren*, 566 F.3d at 1216 (*citing Samson v. California*, 547 U.S. 843 (2006); *United States v. Knights*, 534 U.S. 112 (2001)).

The court concludes that the search of defendant Romero's residence was reasonable under the Fourth Amendment. The court finds that the pictures viewed by the ISO officers on the defendant's web page provided reasonable grounds for them to suspect that the defendant had violated the terms of his probation by possessing a firearm, by associating with gang members, by using or being with people using alcohol, and – given the large amounts of cash depicted and the defendant's prior history and associations – that he was involved in drug distribution. Given the defendant's status since 2000 as a convicted felon, his possession of a firearm at any time thereafter likely would have been a separate criminal offence. The totality of the information available to the ISO's gave them a reasonable basis for suspecting that the firearm depicted in the photos had been in the defendant's home, in his possession, and that it might still be located there. The defense has focused upon the uncertain date of the photos and the unknown date they were posted, but the ISO's could not determine these facts from the web page, and they saw evidence reasonably suggesting the defendant had very recently logged into the web site. The defense also suggested that the officers could have sought a warrant directing the web site company to disclose the date the photos had been posted, but such a procedure likely would have required probable cause of criminal activity – a standard rejected by *Griffin* for probation searches – and at any rate, the issue here is whether the steps taken by the officers

were reasonable, not whether they could have taken other steps. Nothing about the photos showed that they were necessarily out of date, and the totality of the circumstances – including the defendant's recent visit to the site and the underlying source of information that prompted officers to look at the site in the first place – suggested that the photos were likely current. The ISO's clearly had an articulable and specific factual basis for suspecting that the defendant had violated the terms of his probation. Such information might not be sufficient to prove facts beyond a reasonable doubt, but they were sufficient to provide reasonable grounds for the search of a probationer's residence. *See Griffin v. Wisconsin*, 483 U.S. 868, 880 (1987) ("we think it enough if the information provided indicates, as it did here, only the likelihood ("had or might have guns") of facts justifying the search."). *Cf. States of Kansas v. Haffner*, 42 Kan.App.2d 205, 209 P.3d 734, 740 (2009). As part of his probation, the defendant signed an agreement that he would allow a search of his residence upon request by probation officers and with the assistance of law enforcement. The search was conducted pursuant to that authority, and it was supported by a reasonable suspicion of a probation violation and of criminal activity. The search was therefore reasonable under the Fourth Amendment.

III. *Conclusion*.

Defendant's oral motion to substitute counsel is DENIED. Defendant's Motion to Suppress (Doc. 109) is DENIED. IT IS SO ORDERED this __27th__ Day of September, 2010, at Wichita, Ks.

                                         s/Wesley E. Brown
                                         Wesley E. Brown
                                         U.S. Senior District Judge